IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2025 Session

## STATE OF TENNESSEE v. ROY FRAZIER II AND BIONKA MCGAUGHY

**Appeal from the Criminal Court for Shelby County**
**No. 21 01098    Paula L. Skahan, Judge**

_____

**No. W2024-00396-CCA-R3-CD**

_____

In June 2021, the Shelby County Grand Jury issued a three-count indictment charging Roy Frazier II ("Defendant Frazier") with two counts of aggravated rape of a child (Counts 1 and 2) and Bionka McGaughy ("Defendant McGaughy") with child abuse or neglect of a child eight years of age or less (Count 3).  Following a joint trial, a jury convicted Defendant Frazier of aggravated rape of a child in Count 1 and the lesser-included offense of aggravated sexual battery in Count 2, for which he received a sentence of life without parole plus twenty years.  The jury convicted Defendant McGaughy of child neglect of a child eight years of age or less, for which the trial court imposed a sentence of two years to be served in the workhouse.  On appeal, Defendant Frazier contends that: (1) the evidence is insufficient to support his convictions for aggravated rape of a child and aggravated sexual battery; (2) the trial court erred by admitting multiple hearsay statements; (3) the trial court erred by failing to instruct the jury on identity; (4) the trial court misapplied two enhancement factors in sentencing; and (5) the trial court abused its discretion by imposing consecutive sentencing.  For her part, Defendant McGaughy argues that the evidence is insufficient to support her conviction for child neglect of a child eight years of age or less.  Following a thorough review, we affirm the judgments of conviction in all respects.

 **Tenn.  R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Katherine Oberembt (on appeal), and Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, Roy Frazier II.

Phyllis Aluko, Chief Shelby County Public Defender; and Tony N. Brayton (on appeal) and Amy Mayne (at trial), Assistant Shelby County Public Defenders, for the appellant, Bionka McGaughy.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Venecia Patterson and Tanisha Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

At trial, the victim testified that she was nine years old, and she identified Defendant McGaughy as her mother. The victim stated that she knew the difference between the truth and a lie and that she had been instructed to tell the truth while testifying. She said that she had not seen her grandmother, Candy Washington, since she was about five years old. When asked what happened the last time she saw her grandmother, she said that she could not remember but that she recalled going with her grandmother to her cousin Charlotte's house for a sleepover.

The victim testified that, when she was five and six years old, she lived at home with Defendant McGaughy. The victim said that Defendant McGaughy worked "pick[ing] up people and drop[ping] them off where they need[ed] to go" and that she sometimes accompanied Defendant McGaughy. She recalled that there were times she did not go to work with Defendant McGaughy; she said that she stayed at home with Defendant McGaughy's "friend." She said that she was six years old and in second grade when she met her mother's friend. When asked this person's name, the victim replied, "I can't remember." The victim recalled that, when her mother's friend came to the house to watch her, he would cook macaroni and chicken for her. She stated that he would also play "Barbie dolls" with her, which was fun.

The following colloquy then occurred:

> Q. Was there ever a time that you guys did something that was not fun?
>
> A. Yes.
>
> . . . .

Q. Now . . . you said that there were things that you did with mom's friend that you didn't like. What were those things?

A. Touching me.

. . . .

Q. So, where did he touch you that you didn't like?

A. My butt.

The victim stated that her mother's friend would touch her while her mother was at work. She said that she had been in her mother's bedroom watching television when her mother's friend came into the room and touched her. The victim recalled that he touched her on her "butt" and that she had clothes on when this happened. When asked if he had on clothes, the victim replied, "[k]ind of[,]" but she could not explain what she meant. She denied that her mother's friend ever touched her "with [her] clothes off[.]"

The victim then testified that she saw her mother's friend in the courtroom, identified him as Defendant Frazier, and said that his name was Roy. She said that she could not recall what she called Defendant Frazier when she was younger.

The victim identified a DVD of her forensic interview and said that she watched it prior to her testimony. She said that she had been telling the truth during the interview. The victim denied that her grandmother had told her what to testify to, noting that she had not seen her grandmother in years. The following exchange then occurred:

Q. [W]hen you would stay at the house with Roy Frazier, mom's friend, you said that he touched your butt?

A. Yes, ma'am.

Q. Okay. How many times did that happen?

A. Two.

Q. Two times?

A. Yes, ma'am.

- 3 -

Q. Can you tell me about what happened on the two times that it happened?

A. (No audible response.)

Q. How old were you when it happened?

A. Six.

Q. Six.  Where was mommy?

A. At work.

. . . .

Q. Now, when it happened, was it light outside or was it dark outside?

A. Dark outside.

Q. It was dark.  Did your mom work at night?

A. Yes, ma'am.

Q. Okay.  So, it was dark outside.  Was it hot outside or was it cold outside?

A. Cold.

Q. It was cold?

A. Yes, ma'am.

Q. Okay.  Now, was it cold both times?

A. No, ma'am.

Q. So, was it cold one time and hot one time?

A. Yes, ma'am.

Q. Okay. Now, the time that it happened when it was cold outside, do you remember where you were when that happened?

A. My mom['s] room.

Q. You were in your mom's room. Now, what were you doing in your mom's room?

A. Watching TV.

Q. Watching TV. What were you watching?

A. My favorite cartoon.

Q. What's your favorite cartoon?

A. Go on the Go.

. . . .

A. Then [Defendant Frazier] came in the room.

Q. Okay. He came in the room. What happened when he came in the room?

A. (No audible response.)

Q. Do you remember . . . ?

A. No, ma'am.

The victim was then asked about the incident that occurred when it was "hot outside." She testified that she was again in her mother's bedroom watching television when Defendant Frazier came into the room and touched her "butt" and the top of her thighs. Her testimony continued in the following exchange:

Q. What happened after he touched your butt and he touched the top of your leg?

A. (No audible response.)

Q. Do you want to think about it right now . . . ?

A. No, ma'am.

Q. Do you want to say it right now?

A. (No audible response. )

Q. Is it hard?

A. Yes, ma'am.  I can't remember.

. . . .

Q. But do you remember going to the place with a lot of teddy bears?

A. Yes.

Q. Do you remember talking to a lady there?

A. Yes, ma'am.

Q. And when you talked to her, did you tell her what happened?

A. Yes, ma'am.

The victim again identified Defendant Fraizer as the person who had stayed with her when her mother was at work.  She recalled that she referred to him as "Romeo" and agreed that he "was the person that touched [her.]"

Candy Washington testified that the victim was her granddaughter and that Defendant McGaughy was her daughter.  Ms. Washington stated that she last saw the victim "a couple of days after the fourth of July" 2020, when Defendant McGaughy brought the victim to her home to spend the night.  Ms. Washington recalled that her niece, Charlotte, was having a birthday party and that she was going to take the victim to Charlotte's house for the party.  She testified that, as the victim was getting into bed, she noticed that the victim was "walking funny."  Ms. Washington continued:

I said, "Why you walking like that?"  She said, "Nothing."  And I said to myself, . . . I'm gone [sic] check you in the morning because I'm a grand-

mama and I just was . . . used to doing that to her, you know, if [Defendant McGaughy] got a new boyfriend or somebody. I just didn't trust mens [sic]. Cause stuff happened to me when I was young. So, I would always check [the victim] down there, you know, when she was little bathing or whatever.

Ms. Washington stated that she and her husband got into an argument that night, so she took the victim to Charlotte's house, and they spent the night there. The next day, she and the victim were going to take a bath or shower before the birthday party, but the water was cold, so Ms. Washington told the victim that they would have to "wash up[.]" Ms. Washington testified that, when the victim took off her clothes, she "smelled something." She said that she looked at the victim's clothes and noticed that the victim's panties were "nasty" and that there was a "discharge" on them. Ms. Washington described the panties as having a "sex odor."

Ms. Washington testified:

So, I said, come here and let me check you. And so, I laid [the victim] across my lap and I looked down there and she was black and blue. I said, "Girl, who been [sic] messing with you down here?"

. . . .

And she just wouldn't say nothing. She just kept holding her head down.

Ms. Washington explained that Charlotte had four sons and a stepson, who were all at the house. She named each boy, but the victim denied that any of the boys had been "messing with [her] down [t]here[.]" The victim then identified the person as "Romeo." Ms. Washington testified that she had previously heard Defendant McGaughy talk about Romeo and that Defendant McGaughy and Romeo had been "going together for . . . five or six months." Ms. Washington said, however, that she had never met the man.

Ms. Washington stated that she and Charlotte called Defendant McGaughy and told her what the victim said. She explained that, when she told Defendant McGaughy that the victim said Romeo "did this to her[,]" Defendant McGaughy "didn't want to hear it[,]" and she denied that she ever left the victim alone with him. Ms. Washington said that, when Defendant McGaughy denied leaving the victim alone with Romeo, the victim stated, "Mama, yes you did. Two times. And he did it to me two times."

At this point in Ms. Washington's testimony, the following exchange occurred:

Q. Okay. So, was anybody else there with you when this was going on?

A. My nephew was there. My nephew was there, Charlotte was there. Because my nephew said, "If you don't get up and take this girl to Le Bonheur" -

[DEFENDANT FRAZIER'S COUNSEL]: Your Honor, if I may object to all the hearsay that is coming out of the witness's mouth.

THE COURT: Sustained.

Ms. Washington continued in her testimony, explaining that they took the victim to Le Bonheur Children's Hospital ("Le Bonheur") but that, due to the pandemic, only Defendant McGaughy was allowed inside the hospital with the victim. She stated that she waited in the car in the parking lot and that, when they exited the hospital, Defendant McGaughy stated, "Mama, I told you she [was] just chaffed down there [from] wearing tight clothes."

Ms. Washington stated that she took the victim back to her home after the trip to the hospital. She said that she was afraid to return the victim to Defendant McGaughy's residence because Defendant McGaughy did not believe the victim. Ms. Washington recalled that she took the victim to the Memphis Child Advocacy Center, where "[t]hey took [the victim] in the back and talked to her." She said that she then returned the victim to Defendant McGaughy because Defendant McGaughy threatened to file kidnapping charges against her. She stated that Defendant McGaughy later allowed Defendant Frazier to move in with her.

Ms. Washington said that she went to Defendant McGaughy's residence in Memphis on the day the victim was being removed from the home. Ms. Washington stated that Defendant McGaughy would not allow the victim to be placed with her and that, instead, the victim stayed with Defendant McGaughy's friend, Nicki. She said that she had not seen the victim since that day.

Ms. Washington denied ever telling the victim "what to say[.]" She explained:

[The victim] didn't even want to tell me what happened. She talked to the [people at the Memphis Child Advocacy Center more] than she talked to me. She told me a few things, but she didn't even want to talk to me. She just . . . didn't want to talk to me about it.

- 8 -

On cross-examination, Ms. Washington stated that, at the time of the victim's disclosure, Defendant McGaughy was working nights as a driver for Door Dash and Uber. She said that Defendant McGaughy was taken to jail when she refused to provide police with Romeo's real name. Ms. Washington recalled that, on the day of the disclosure, she had left Charlotte's house to go to work and that the victim had spent the day with Charlotte; she said that the victim made the disclosure after she returned from work as they were getting ready for the birthday party. She could not recall the exact date of the disclosure. She said that she tried to question the victim about the abuse but that the victim "didn't want to talk about it." Ms. Washington stated that she saw the victim again when the victim went to stay with Nicki. She said that the victim's father then obtained custody of the victim and "cut off all visitation rights[.]"

Ms. Washington testified that Defendant McGaughy was "vulnerable" and that Defendant Frazier "preyed on her and [the victim]." She said that Defendant McGaughy was "sort of mental" and a "bipolar schizophrenic." She said that, once Defendant McGaughy began her relationship with Defendant Frazier, Defendant McGaughy "changed[.]" She maintained that Defendant McGaughy was focused on Defendant Frazier and stopped spending time with her family. Ms. Washington reiterated that she never met Defendant Frazier.

On redirect, the following exchange occurred:

> Q. Okay. And at any time, just to be clear, did you tell [the victim] what to say?
>
> A. No. I ain't [sic] have no reason to.
>
> Q. Did you suggest Romeo to her?
>
> A. No. When she said it, that's why I was like who in the hell is Romeo.

Kristine Gable, a nurse practitioner, testified that she worked as a sexual assault nurse examiner at the Shelby County Rape Crisis Center. She said that she performed a forensic medical examination on the victim on July 28, 2020. She recalled that the victim and Defendant McGaughy came to the rape crisis center with an investigator from the Tennessee Department of Children's Services ("DCS"). Ms. Gable explained that the victim was six years old at the time of the exam. She tested the victim for sexually transmitted diseases; she stated that the victim tested negative. She said that she gave Defendant McGaughy a copy of her report on November 13, 2020.

- 9 -

Ms. Gable said that, before the exam, she spoke separately to the victim, Defendant McGaughy, and the DCS investigator to obtain a history of the sexual abuse. She testified that Defendant McGaughy reported the victim "told [her] maternal grandmother that mom left her with mom's friend, Michael Smith, who is in his 40's while mom went to work. Mom states he was supposedly rubbing on her butt and private part." Ms. Gable testified that, when she spoke to the victim, the victim said, "My grandma made me lie and she thinks I got touched because I was red down there. But I didn't. I didn't. I didn't. She thinks I got touched from my mama's friend." The victim told Ms. Gable that she did not know the name of Defendant McGaughy's friend, that she "went to Le Bonheur and got checked," and that her "mama's friend did not touch [her]." Defendant McGaughy reported to Ms. Gable that the victim was "sore from [a] rash" and that the victim was seen at Le Bonheur where she was diagnosed with dermatitis on July 12, 2020. When asked whether the nurses at Le Bonheur were as experienced in conducting sexual assault examinations as the nurses at the rape crisis center, Ms. Gable replied, "No."

Regarding her examination of the victim, Ms. Gable stated that she found the victim had erythematous, or redness, in the area "just outside the opening to the vagina, between the labia." She said that she found no injuries to the victim and noted that the redness was not considered an injury. When Ms. Gable was asked "whether [in] minors or adults . . . is it uncommon to not see any injuries in sexual assault victims[,]" the following exchange took place:

> A. It's very common not to see injuries in any age.
>
> Q. Why is that?
>
> A. Well, for one thing whatever happened to the individual may not have caused an injury . . . or whatever happened caused an injury that's healed.
>
> That part of the body heals really fast.

Ms. Gable stated that an injury to the genital area would heal within days and that she would not expect to see injuries "in a minor child" sixteen days after the alleged sexual abuse.

Ashley McKinney testified that Defendant McGaughy was her cousin's ex-girlfriend and that she had known her for about five years. She said that she used to live in the same apartment complex as Defendant McGaughy. Ms. McKinney testified that she knew Romeo because he used to date Defendant McGaughy and recalled that she would see him "leaving and coming."

Ms. McKinney stated that, on October 2, 2020, Defendant McGaughy was arrested, and the victim came to her apartment because the victim "had said Romeo had been touching on her." Ms. McKinney testified that, while in her apartment, a worker from Child Protective Services ("CPS") spoke to the victim about what had happened. Ms. McKinney recalled that the victim stayed with her for about a week before the victim's father was contacted. She explained that she had been around the victim "all the time[.]" She said that the victim was a "truthful" child.

On cross-examination, Ms. McKinney agreed that, after Defendant McGaughy got out of jail, the victim said that the "entire incident never happened." Ms. McKinney explained that she, the victim, and Defendant McGaughy were outside her apartment in the parking lot. Ms. McKinney "asked [the victim] and then [the victim] said the same thing that he had touched her." Defendant McGaughy then said, "[T]ell the truth. Tell the truth." Ms. McKinney stated that "it was like [the victim] was being coached to say that he didn't touch her." Ms. McKinney said that this interaction occurred after she had been given temporary custody of the victim. She said that she was later told by a CPS worker not to allow the victim to talk to Defendant McGaughy.

Clarion Harris testified that she worked as an investigator with CPS. Ms. Harris stated that, on October 2, 2020, she went to Defendant McGaughy's residence with her co-worker, Markita Clayton. She recalled that, when they arrived, Ms. Clayton and a detective spoke to Defendant McGaughy outside, and she was asked to sit inside with the victim. Ms. Harris said that she and the victim began playing with the victim's dolls. Ms. Harris testified:

So, she just began to just tell me a little bit about the dolls. So, I asked her . . . who did she normally play with. She said, you know, there's no kids living there. And I asked her who she lived with. And she said her mom and her dad.

The following exchange then occurred:

Q. Okay. Did [the victim] she tell you who her dad was?

A. She stated her dad was Romeo.

Q. Okay. And did she tell you anything else about Romeo?

A. Yes. So, she told me that -- I asked her where he was. She said that he had left. Then I asked her -- I asked her, you know, does he always leave. She said . . . yeah. Sometimes he'll come back. And then I asked her,

- 11 -

you know, who does she normally stay at home with. And she said sometimes her mom leaves and she's there with Romeo. And then I asked her . . . when was the last time she was with Romeo and she said that Wednesday.

Ms. Harris testified that the Wednesday before October 2, 2020, was September 30, 2020. She continued:

So, I asked her, . . . what did y'all do on Wednesday. And she said they cooked dinner. And I said, you know, what did y'all eat. She told me they ate chicken nuggets and macaroni. I asked her where her mom was.

And she said that her mom had went out to a party and she pointed [at] a liquor bottle. I remember it was a Svedka bottle. It was a pink bottle she said that her mom was drinking. So, I asked her . . . what did they do after dinner. And she said they went into the bedroom and made love.

Q. Okay. Did she tell you who it was that she made love with?

A. Her dad.

Q. Okay. And who did she say was her dad?

A. Romeo.

Q. What happened after they made love?

A. She told me that after they made love, I asked her, you know, . . . what was that. And she said touching her privates. So, I asked her how she -- how did that make her feel. And she said that, you know, she doesn't get upset because he doesn't like when she cries.

Ms. Harris testified that she later informed Ms. Clayton about her conversation with the victim.

Lieutenant Angela Tucker with the Memphis Police Department ("MPD") testified that she had worked in the department's Sex Crimes Unit since 2016. She said that she became the lead investigator on the victim's case on August 7, 2020, after the case was turned over by DCS. Lieutenant Tucker explained that she first spoke to Defendant McGaughy and Ms. Washington. When she talked to Defendant McGaughy, Defendant McGaughy said that "nothing happened to [the victim]." Defendant McGaughy told her

- 12 -

that Romeo was "a friend of hers." Lieutenant Tucker testified that she asked Defendant McGaughy about Romeo's real name and that Defendant McGaughy said his name was Michael but would not tell her his last name. When Lieutenant Tucker asked Defendant McGaughy how long she had known Romeo, Defendant McGaughy responded, "[J]ust a couple of weeks."

Lieutenant Tucker said that, after she spoke to Ms. Washington, she again attempted to "get Romeo's information" but that she "had a hard time because [Defendant McGaughy] didn't want to tell me who Romeo was." Lieutenant Tucker explained that Defendant McGaughy "would scream and holler" at her and tell her that "nothing ever happened to [the victim]."

Lieutenant Tucker explained that she went to Defendant McGaughy's residence on the day that DCS was going to remove the victim. She agreed that DCS had received another referral indicating that "there was something happening still at the house." She testified that she had been to the residence previously to attempt to get additional information about Romeo. She said that Defendant McGaughy would not answer her calls, so Lieutenant Tucker "showed up at her address." While at the residence, Lieutenant Tucker discovered that Defendant McGaughy was not home but that the victim was there with a man, who identified himself as Mr. Pettis. Lieutenant Tucker asked Mr. Pettis if he had a nickname; he said that he did but that it was not Romeo. At that point, Lieutenant Tucker asked the victim if Mr. Pettis was "Romeo," but she said, "It's not Romeo. Romeo is with my mom."

Lieutenant Tucker said that she later contacted Defendant McGaughy by phone and asked about Mr. Pettis. Defendant McGaughy screamed at her and told her to stop "just showing up at her home." Lieutenant Tucker testified, "And I asked her again for Romeo's information. She screamed and hollered and then a male got on the phone." Lieutenant Tucker asked the man if he was Romeo, but he would not identify himself.

Lieutenant Tucker stated that, on the day DCS was at Defendant McGaughy's residence to remove the victim, she arrested Defendant McGaughy for child endangerment. She testified that, once Defendant McGaughy was placed in the patrol car, Defendant McGaughy provided information on Romeo, claiming that Mr. Pettis was Romeo. Lieutenant Tucker explained that she again spoke to Mr. Pettis, who told her, "[T]hat's not me. She's trying to cover up for Romeo." Lieutenant Tucker said that Defendant McGaughy eventually told her that Romeo was Defendant Frazier. Defendant McGaughy also provided Lieutenant Tucker with the code for her phone, and when Lieutenant Tucker unlocked it, she found Defendant Frazier's information under the name "Daddy." Lieutenant Tucker testified that Defendant Frazier was later captured in Las Vegas "quite some time" after Defendant McGaughy's arrest.

- 13 -

Teresa Onry, a forensic interviewer at the Memphis Child Advocacy Center, testified that she conducted the victim's forensic interview on July 22, 2020. Ms. Onry testified that she had no contact with the victim's family members. She identified the DVD recording of the forensic interview, and it was played for the jury.

During the forensic interview, the victim told Ms. Onry that she "can't be around momma's friend no more because he did something bad to [her] while she was at work." The victim identified the "friend" as "Romeo," though she knew that was not his actual name. She reported that, when her mother was at work, Romeo called her into her mother's room, told her to lie down, and got on top of her. The victim explained that she was wearing clothes, but Romeo "had his off." She said that Romeo took her hand and made her "rub on his middle part[,]" and she demonstrated that he had her rub it in an up-and-down manner. The victim told Ms. Onry that Romeo's "middle part" felt like a "bone." The victim said that Romeo made her get on top of him, and he "put his hand on [her] butt." He then told her to lie down, pulled her pants and panties down, and got on top of her again. She said that Romeo "put his middle part in it" and that his middle part "was getting wet." The victim told Ms. Onry that Romeo had done the same thing to her before, and she denied that anyone else had touched her like that. Ms. Onry provided anatomical drawings, and the victim identified Romeo's "middle part" as a penis. She also identified the vagina as a girl's "middle part."

Regarding the interview, Ms. Onry explained that the victim "pretty much led that interview" and that she "just jumped in to . . . grab minor details about what [the victim] disclosed." Ms. Onry explained that children the age of the victim at the time of the interview do not have a good concept of time. She said that, during interviews, she looked for signs of coaching, explaining that such signs included a child "using terms that we would kind of hold as adult[-]like terms." Ms. Onry stated that she saw no signs that the victim was coached. She testified, "[The victim] talked about things that a child her age should not know about. She described things in a way I would expect her to explain at her age. Her talking about Romeo's penis feeling like a bone. That's how I would expect her to explain it."

Markita Clayton, an investigator with DCS, testified that DCS and MPD's Juvenile Sex Crimes Unit were located in the Memphis Child Advocacy Center. Ms. Clayton explained that DCS received a referral about the victim, alleging sexual abuse and lack of supervision. She stated that, when she was assigned the case, she immediately looked for the victim, whom she learned was with her grandmother, Ms. Washington, in Arkansas. She said that, after contacting Ms. Washington, Ms. Washington and her niece, Charlotte, brought the victim to the Child Advocacy Center, where Ms. Clayton spoke to the victim, Ms. Washington, and Charlotte. Ms. Clayton testified that the victim made a disclosure of abuse to her.

- 14 -

Ms. Clayton stated that she had difficulty locating Defendant McGaughy but that she eventually interviewed her at her residence. Ms. Clayton explained the purpose of the interview and let her know what the victim disclosed. She said that Defendant McGaughy denied the victim had been around men in the home. Defendant McGaughy admitted that she had a "friend" called Romeo. Defendant McGaughy claimed that she did not know Romeo's real name but said she "thought his name might be Michael." Ms. Clayton testified that she later "reached out to Michael" about the victim's allegations but that he did not know "what [she] was talking about."

Ms. Clayton testified that Defendant McGaughy told her she took the victim to the hospital and reported that the victim was diagnosed with contact dermatitis and that her "underwear may have been a little bit too tight." Ms. Clayton said that she later requested the victim's medical records from the hospital and that the records reflected the information provided by Defendant McGaughy; she said, however, that there was nothing in the records "about a possible sexual assault[.]"

Ms. Clayton said that, at the end of the interview with Defendant McGaughy, Defendant McGaughy signed a noncustodial permanency plan and safety plan, in which she agreed to keep the victim "away from people [the victim] was not comfortable with." She stated that, under the plan, the victim was to remain with Defendant McGaughy and that Defendant McGaughy was to protect the victim.

Ms. Clayton testified that, on July 22, 2020, Defendant McGaughy brought the victim to the Memphis Child Advocacy Center for a forensic interview. Ms. Clayton, who watched the interview in real time, described the victim's disclosure as "very vivid . . . to be six years old." She said that, after the forensic interview, she informed Defendant McGaughy that the victim made a disclosure of abuse.

Ms. Clayton said that she presented the case to the child protective investigation team, which substantiated the allegations against Defendant Frazier, and then she closed the case. She explained that, when DCS closed a case, it meant that the department did not "need to do any further investigative task[s]."

Ms. Clayton stated that DCS received a second referral regarding the victim on October 1, 2020. She went to Defendant McGaughy's residence on October 2, 2020, and spoke to the victim. The victim made "another disclosure[,]" and Ms. Clayton decided to remove the victim from the home. Ms. Clayton testified that a second forensic interview and medical examination of the victim were not conducted. She stated, "We don't want to continue to take the child through those traumatic events of . . . coming in the room, . . . speaking of . . . what has happened to them and someone examining their . . . private area. That's trauma."

- 15 -

Ms. Clayton stated that, when she told Defendant McGaughy there was a second referral, Defendant McGaughy responded that "it was not true. Her daughter [was] never around any men." Ms. Clayton told Defendant McGaughy that she needed Romeo's real name. Ms. Clayton testified, "[Defendant McGaughy] did give us a Romesco, a Roy Frazier and an ex. She also gave, I think a Marcus Pettis. And we did reach out to either Marcus Pettis or Marcus Spencer and they didn't know what I was talking about." The following exchange then took place:

Q. Okay. So, you got a number of names from [Defendant] McGaughy; is that right?

A. That's right.

Q. And then finally you got to name Roy Frazier?

A. Umm-hmm.

Q. You have to say yes or no.

A. Yes, ma'am. I'm sorry.

Q. That's fine. Now, did [Defendant] McGaughy say where Roy Frazier or Romeo was?

A. She did not say, but he was not at the home.

Ms. Clayton explained that she established an immediate protection agreement, wherein Defendant McGaughy chose her friend, Ms. McKinney, to care for the victim. Ms. Clayton said that she later filed a petition to change custody of the victim to the victim's father because the victim had a relationship with her father. She said that Defendant McGaughy was supposed to have no contact with the victim after the victim was removed from her care. Ms. Clayton testified that, on the second referral, she substantiated the allegations against Defendant McGaughy for "lack of supervision and for sexual abuse" and substantiated the allegations of sexual abuse against Defendant Frazier.

At the close of the State's proof, the trial court reduced Count 2 of the indictment to the lesser-included offense of aggravated sexual battery of a child less than thirteen years of age. The State then made the following election of offenses:

[F]or . . . the alleged act of Aggravated Rape of a Child . . . the event described as being when it was hot outside. [The victim] was in her mother's

room when Romeo put his middle part into her middle part and she felt it getting wet. [The victim] was six years old.

. . . .

[F]or . . . the alleged act of Aggravated Sexual Battery of a Child the act . . . when it was cold outside on a Wednesday after eating a dinner of macaroni and chicken nuggets, Romeo took [the victim] into her mother's room and made love to her and touched her bottom. [The victim] was six years old.

Following deliberations, the jury found Defendant Frazier guilty of aggravated rape of a child in Count 1 and aggravated sexual battery of a child less than thirteen years old in Count 2. The jury found Defendant McGaughy guilty of child neglect of a child eight years of age or less.

At Defendant Frazier's subsequent sentencing hearing,[1] the trial court imposed the statutorily mandated sentence of life without parole for his aggravated rape of a child conviction. As to the conviction for aggravated sexual battery of a child less than thirteen years of age, the State presented certified copies of Defendant Frazier's prior convictions, as well as his presentence report. The parties agreed that, based upon his prior convictions, Defendant Frazier was a Range II offender with a sentencing range of twelve to twenty years. No other proof was presented.

Following arguments of counsel, the trial court found as an enhancement factor that Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range, noting Defendant's prior convictions for theft; aggravated burglary; attempted aggravated sexual battery; failure to appear; driving on a revoked license; domestic assault; statutory rape by an authority figure; and multiple counts of violation of community supervision. Additionally, the trial court found as an enhancement factor that, at the time the felony was committed, Defendant Frazier "was involved in . . . supervision through the State of Tennessee Community Supervision for Life." The court also found that Defendant Frazier abused a position of private trust "in that Ms. McGaughy thought that [Defendant] Frazier was watching her daughter, foolish as that was." In consideration of the enhancement factors, the court sentenced Defendant Frazier to twenty years at 100 percent service for aggravated sexual battery of a child less than thirteen years of age.

---

[1] Because Defendant McGaughy does not challenge her sentence on appeal, our sentencing summary is limited to the evidence presented at Defendant Frazier's sentencing hearing.

- 17 -

The trial court noted that consecutive sentencing was discretionary and determined that "[t]his case . . . does cry out for consecutive sentencing." The court found that Defendant Frazier "is an offender whose record of criminal activity is extensive" and that he "is convicted of two or more statutory offenses involving sexual abuse of a minor[.]" The court continued:

> With consideration of the aggravating circumstances . . . arising from the relationship between the defendant and the victim in this case, she was stuck with him in that house. There was nothing a six-year-old could do when her mother abandoned her to [Defendant Frazier], . . . her so-called boyfriend. There was nothing that child could do. She tried to get help from her grandmother, and her mother wouldn't listen. Time span of the undetected sexual activity -- it was detected, but anyway, it spanned over many months. The nature and scope of the sexual acts. He had penile-vaginal sexual intercourse with a six-year-old. Horrible.
>
> . . . .
>
> Nature and scope of the sexual acts and the extent of residual physical [and] mental damage on that child will be forever.

Based upon these findings, the trial court ordered Defendant Frazier's twenty-year sentence to run consecutively to his sentence of life without parole.

Defendant Frazier and Defendant McGaughy each filed a timely motion for new trial, which the court denied after a hearing. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the evidence

On appeal, both defendants challenge the sufficiency of the evidence supporting their convictions. Specifically, Defendant Frazier contends that no rational trier of fact could have found he committed aggravated rape of a child "on or after July 1, 2020[,]" as alleged in Count 1 of the indictment. Regarding his conviction for aggravated sexual battery, Defendant Frazier insists that the victim's testimony about the offense was vague, inconsistent, and lacked corroborating physical evidence. As for her conviction for child neglect, Defendant McGaughy asserts that the evidence is insufficient to establish that she knowingly neglected the victim and that the neglect adversely affected the victim's health and welfare.

- 18 -

The State responds that the evidence is sufficient to support Defendant Frazier's and Defendant McGaughy's convictions. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the defendant bears the burden of proving why the evidence was insufficient to support the conviction, *Bland*, 958 S.W.2d at 659, and the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

## 1. Aggravated rape of a child

"The first step in evaluating the sufficiency of the evidence is to identify the elements of the offense." *State v. Rimmel*, __ S.W.3d __, No. M2022-00794-SC-R11-CD, 2025 WL 717397, at *4 (Tenn. Mar. 6, 2025) (citing *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021)). Aggravated rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is eight (8) years of age or less." Tenn. Code Ann. § 39-13-531(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7).

The identity of the perpetrator is an essential element of any crime. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established by circumstantial evidence alone. *See State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). As previously noted, our standard of review is now the same for direct and circumstantial evidence, including the evidence presented at the trial to establish the element of identity. *See Dorantes*, 331 S.W.3d at 381.

When viewed in the light most favorable to the State, the evidence shows that the victim was six years old and in second grade when her mother, Defendant McGaughy, began leaving her at home alone with Defendant Frazier. The victim identified Defendant Frazier and testified that he would touch her inappropriately while Defendant McGaughy was at work. She said that she had been in her mother's bedroom watching television when Defendant Frazier came into the room and touched her and that it was hot outside during one of the incidents. The victim's grandmother, Ms. Washington, testified that when the victim spent the night with her in July 2020, she noticed that the victim was "walking funny." The next day, as she and the victim were getting ready for a birthday party, the victim took off her clothes, and she noticed that the victim's panties had a "sex odor" and contained a "discharge." Ms. Washington testified that she checked the victim "down there" and observed that the victim was "black and blue." She took the victim to the Memphis Child Advocacy Center for a forensic interview on July 22, 2020.

During the interview, a recording of which was played for the jury, the victim disclosed that, while her mother was at work, Defendant Frazier called her into her mother's room, told her to lie down, and got on top of her. The victim explained that she was wearing clothes, but Defendant Frazier "had his off." She said that Defendant Frazier took her hand and made her "rub on his middle part[,]" and she demonstrated that he had her rub it in an up-and-down manner. The victim said that Defendant Frazier's "middle part" felt like a "bone." The victim explained that Defendant Frazier made her get on top of him, and he "put his hand on [her] butt." He then told her to lie down, pulled her pants and panties down, and got on top of her again. She said that Defendant Frazier "put his middle part in it" and that his middle part "was getting wet." When provided with anatomical drawings during the forensic interview, the victim identified Defendant's Frazier's "middle part" as a penis and identified a girl's "middle part" as a vagina. The evidence is sufficient to establish that Defendant Frazier committed aggravated rape of a child.

Defendant Frazier argues that the rape had to have occurred before the date range included in the indictment—between July 1, 2020, and October 2, 2020. He points to Ms. Washington's recollection that she became aware of the abuse a couple of days after the Fourth of July 2020. However, Ms. Washington testified that she immediately contacted Defendant McGaughy, and they took the victim to Le Bonheur. Ms. Gable testified that the victim was seen at Le Bonheur on July 12, 2020. Ms. Gable further testified that any injury to the victim's genital area would have healed within days. Thus, we agree with the State that a rational juror could reasonably conclude that the rape took place within twelve days of Ms. Washington's noticing the signs of abuse on the victim. Defendant Frazier's argument is without merit.

- 20 -

## 2. Aggravated sexual battery

As relevant here, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant," and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6). "Intimate parts" includes, among other things, "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2).

In the context of aggravated sexual battery convictions, this court has observed that "it is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." *State v. Thompkins*, No. E2023-00209-CCA-R3-CD, 2023 WL 8112826, at *3 (Tenn. Crim. App. Nov. 21, 2023) (citation and internal quotation marks omitted), *no perm. app. filed*; *see also State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005). Moreover, "whether [the defendant] touched the victim . . . for the purpose of sexual arousal or gratification [is] a question of fact for the jury to determine." *State v. Welch*, No. M2016-01335-CCA-R3-CD, 2019 WL 495117, at *5 (Tenn. Crim. App. Feb. 8, 2019), *no perm. app. filed*.

When viewing the evidence in the light most favorable to the State, the victim testified that, when she was six years old, she was in her mother's bedroom watching her favorite cartoon when Defendant Frazier came into the room and touched her "butt." The victim testified that she had clothes on when this happened and that it was cold outside. Ms. Harris testified that, when she responded to the victim's residence on October 2, 2020, the victim told Ms. Harris that, on the previous Wednesday, Defendant Frazier made her chicken nuggets and macaroni and that, after they ate, they went to the bedroom where they "made love," and Defendant Frazier "touch[ed] her privates." From this, a rational trier of fact could have concluded that Defendant Frazier intentionally touched the victim's intimate parts for the purpose of sexual arousal or gratification when the victim was under thirteen years of age. The evidence is sufficient to sustain his conviction for aggravated sexual battery.

Defendant Frazier maintains that the victim was not credible, citing inconsistencies in her testimony, her previous recantations of the abuse allegations, and a lack of corroboration supporting her claims. However, questions of fact, the credibility of witnesses, and the weight of the evidence were resolved by the jury, and we will not reweigh the evidence or disturb the jury's credibility assessment. *See Bland*, 958 S.W.2d at 659. Defendant Frazier is not entitled to relief on this claim.

### 3. Child neglect

Regarding Defendant McGaughy's conviction, Tennessee Code Annotated section 39-15-401(b) states that "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony." Our supreme court has explained that, to convict a defendant of child neglect, "the act of . . . neglecting the child must be knowing conduct." *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000). A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(23).

Additionally, the State must show "something more than a risk of harm to a child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 671 (Tenn. 2001). It must establish that the defendant's neglect "produced an actual, deleterious effect or harm upon the child's health and welfare." *Id*. at 672. This "may include, but is not limited to, adverse effects on the emotional and mental health and welfare of the child[.]" Tenn. Code Ann. § 39-15-401(h).

When viewed in the light most favorable to the State, the evidence established that, when the victim was six years old, Defendant McGaughy met Defendant Frazier and, "a couple of weeks" later, began leaving the victim at home alone with him while she was working. In July 2020, when the victim disclosed that Defendant Frazier had raped her, Defendant McGaughy "didn't want to hear it"; she denied that she ever left the victim alone with him and said that "nothing happened to [the victim]." She also refused to tell police and DCS workers Defendant Frazier's real name.

Following the victim's disclosure, Defendant McGaughy signed a noncustodial permanency plan and safety plan, in which she agreed to protect the victim and keep the victim "away from people [the victim] was not comfortable with." Nevertheless, Defendant McGaughy later allowed Defendant Frazier to move in with her and the victim, which resulted in Defendant Frazier being able to sexually abuse the victim again. When discussing the incident that occurred immediately prior to the October 2020 disclosure, Ms. Harris asked the victim how it made her feel when Defendant Frazier "touch[ed] her privates." The victim told Ms. Harris that she "doesn't get upset because [Defendant Frazier] doesn't like when she cries." From this, any rational juror could reasonably conclude that Defendant McGaughy knowingly neglected a child under eighteen years of age, so as to adversely affect the child's health and welfare.

Defendant McGaughy insists that the victim did not suffer an "actual deleterious effect or harm," noting that Ms. Gable and medical personnel at Le Bonheur did not observe any significant injuries to the victim. However, Ms. Gable testified how the genital area of the body "heals fast" in just "[d]ays," and as noted by the State, both medical examinations took place in July; there were none conducted after the October disclosure. In any event, this court has emphasized that "every rape is physically and mentally injurious to the victim." *State v. Thompson*, Nos. M2003-00487-CCA-R3-CD & M2003-01824-CCA-R3-CD, 2004 WL 2964704, at \*19 (Tenn. Crim. App. Dec. 20, 2004), *no perm. app. filed.* The evidence is sufficient to sustain Defendant McGaughy's conviction for child neglect, and she is not entitled to relief.

### *B. Hearsay statements*

Defendant Frazier also contends that the trial court erred by allowing witnesses to testify to hearsay statements made by the victim. Specifically, he points to the following: (1) Ms. Washington's testimony that, when she asked the victim who was "messing with" her, the victim said, "Romeo"; (2) Ms. Washington's testimony that, when Defendant McGaughy denied leaving the victim alone with Romeo, the victim said to Defendant McGaughy, "[Y]es you did. Two times. And he did it to me two times"; (3) testimony from Ms. McKinney that the victim came to stay with her for a week "[b]ecause she had said Romeo had been touching on her"; (4) testimony from Ms. Harris that the victim told her she "lived with her dad" and "her dad was Romeo"; and (5) Ms. Harris's testimony that the victim said she and Defendant Frazier "went into the bedroom and made love," which involved him "touching her privates." Defendant Frazier insists that there were no applicable exceptions to the rule against hearsay that allowed for the admission of these statements.

The State responds that Defendant Frazier has waived this issue and that he cannot establish he is entitled to plain error relief. We agree with the State.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). It is clear from the record that Defendant Frazier did not object to any of the above-referenced statements at trial. Although Defendant Frazier cites his objection during Ms. Washington's testimony to "all the hearsay," this objection was not contemporaneous to testimony about the victim's statements—it occurred when Ms. Washington was describing what her nephew said to her. Moreover, Defendant Frazier failed to raise the issue in his motion for new trial. Tenn. R. App. P. 3(e) (stating that "in all cases tried by a

- 23 -

jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). Thus, he waived plenary review of this issue.

"When necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendant Frazier has not established that he is entitled to plain error relief. Under the Tennessee Rules of Evidence, hearsay is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(1.1) states that the hearsay rule does not exclude a "statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." The rule is not limited to prior identifications from photographs, lineups, or other similar procedures and can include a statement made to another person. *State v. Stout*, 46 S.W.3d 689, 698-99 (Tenn. 2001), *superseded by statute on other grounds as recognized in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004) and *State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013). Ms. Washington's testimony that the victim identified "Romeo" as the person "messing with" her was admissible under Rule 803(1.1). The victim had the opportunity to perceive Defendant Frazier, and she testified at trial and was subject to cross-examination. The victim's statement to Ms. Harris that she lived with her dad, Romeo, would also likely fall under this exception to the hearsay rule.

Additionally, several of the victim's statements could have been offered to prove the effect on a listener rather than offered for the truth of the matter asserted. *See State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (concluding that a statement was not hearsay because it was offered "because of its effect on the hearer"). For example, the testimony from Ms. McKinney that the victim came to stay with her for a week "[b]ecause she had said Romeo had been touching on her" explains why Ms. McKinney allowed the victim to stay at her apartment. Testimony that the victim said to Defendant McGaughy, "[Y]es you did. Two times. And he did it to me two times" showed that Defendant McGaughy was on notice of the allegations against Defendant Frazier and went to establishing her knowing neglect of the victim. Thus, Defendant Frazier has failed to show that a clear and unequivocal rule of law was breached.

Further, Defendant Frazier has failed to show that a substantial right was affected. A "substantial right" is one of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." *State v. Schiefelbein*, 230 S.W.3d 88, 119 (Tenn. Crim. App. 2007) (quoting *Adkisson*, 899 S.W.2d at 639). Accordingly, this court has repeatedly commented on the difficulty defendants have in establishing plain error for an evidentiary ruling. *See Elmore v. State*, No. E2005-02263-CCA-R3-PC, 2006 WL 2482949, at *3 (Tenn. Crim. App. Aug. 29, 2006) ("Rarely will plain error review extend to an evidentiary issue."), *perm. app. denied* (Tenn. Dec. 18, 2006); *see also Stokes v. State*, No. W2018-01435-CCA-R3-PC, 2019 WL 5681476, at *13 (Tenn. Crim. App. Oct. 31, 2019), *perm. app. denied* (Tenn. Feb. 27, 2020); *State v. Childress*, No. M2016-00799-CCA-R3-CD, 2016 WL 7468206, at *5 (Tenn. Crim. App. Dec. 28, 2016), *no perm. app. filed*; *State v. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007), *no perm. app. filed*.

Defendant Frazier has also not shown that waiver of this issue was not tactical. "The decision about whether to object is a strategic and tactical decision[,]" *Whitehair v. State*, No. M2019-00517-CCA-R3-PC, 2020 WL 916061, at *19 (Tenn. Crim. App. Feb. 26, 2020), *perm. app. denied* (Tenn. July 17, 2020), and it is entirely possible that Defendant Frazier's counsel chose not to object so as to not draw further attention to the challenged statements.

Finally, Defendant Frazier has not shown that consideration is necessary to do substantial justice. He has not shown that any of the challenged statements was "of sufficient magnitude that it probably changed the outcome of the trial[.]" *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010). Therefore, he is not entitled to plain error relief.

## C. Jury instruction on identity

Defendant Frazier argues that the trial court erred by failing to instruct the jury "with either an enhanced identification instruction or the generic identity pattern charge." Defendant Frazier asserts that he "put identity at issue by cross-examining witnesses about other men who had access to [the victim]" and that "the only evidence connecting [him] to the crimes . . . was an in-court identification made by a child victim more than three years after the indicted offenses took place."

The State responds that Defendant Frazier waived this issue by failing to contemporaneously object and by failing to include the issue in his motion for new trial. The State contends that Defendant Frazier cannot show that plain error relief is warranted. We agree with the State.

A trial court in a criminal case is required to give "a complete charge of the law applicable to the facts of the case[.]" *Thompson*, 519 S.W.2d at 792. "[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *Id*. The right is constitutional in nature. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002).

In *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995), the Tennessee Supreme Court promulgated a comprehensive jury instruction to be used in cases where identity is a material issue. The instruction, which was later incorporated into the Tennessee Pattern Jury Instructions, sets forth a list of factors for the jury to consider in determining whether the State has met its burden of proving "identification of the defendant as the person who committed the crime." *Id*.; *see* T.P.I.—Crim. 42.05. Those factors include:

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

*Dyle*, 899 S.W.2d at 612.

The *Dyle* Court held that this instruction must be given when identification is a material issue, and it is requested by the defendant. *Id.* Failure to give the instruction under these circumstances is plain error. *Id.* The court further held that, if identification is a material issue and the defendant does not request the instruction, the failure to give the enhanced instruction will be reviewable "under a Rule 52 harmless error standard."[2] *Id.* Identity is a material issue "when the defendant puts it at issue or the eyewitness testimony is uncorroborated by circumstantial evidence." *Id.* n.4.

In this case, Defendant Frazier never requested that the trial court give a particular identity instruction to the jury, and he failed to raise the issue in his motion for new trial. As explained, had he properly raised the issue of the enhanced identification instruction in his motion for new trial, it would be subject to harmless error review despite his failure to request the instruction at trial. *See id.* Because Defendant Frazier did not raise this issue in his motion for new trial, however, the issue is waived. Tenn. R. App. P. 3(e); *see also State v. Turner*, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."). Likewise, Defendant Frazier waived any issue regarding the trial court's failure to instruct the jury using the "generic" identity instruction, *see* T.P.I.—Crim. 42.05(a), by failing to raise the issue before the trial court. *Turner*, 919 S.W.2d at 356-57.

Moreover, he has not requested relief via plain error. *See State v. Scott*, No. W2022-01145-CCA-R3-CD, 2024 WL 2293240, at *9 (Tenn. Crim. App. May 21, 2024), *perm. app. denied* (Tenn. Oct. 25, 2024); *State v. Samuel*, No. E2020-01033-CCA-R3-CD, 2022 WL 3700890, at *10 (Tenn. Crim. App. Aug. 26, 2022) (noting that the defendant "is not entitled to plain error review of the [issue] because he has not requested such review"), *no perm. app. filed*; *State v. Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *21 (Tenn. Crim. App. Sept. 24, 2019), *perm. app. denied* (Tenn. Feb. 20, 2020); *State v. Armstrong*, No. W2016-01996-CCA-R3-CD, 2017 WL 6375950, at *16 (Tenn. Crim. App. Dec. 12, 2017), *perm. app. denied* (Tenn. Apr. 23, 2018). Under these circumstances, relief is not warranted. *See Bledsoe*, 226 S.W.3d at 355.

---

[2] The text of Rule 52 ("Harmless Error and Plain Error") of the Tennessee Rules of Criminal Procedure was deleted in 2009, and harmless error and plain error standards are now covered by amended Tennessee Rule of Appellate Procedure 36(b).

### D. Sentencing

Finally, Defendant Frazier argues that the trial court abused its discretion when imposing his sentence. He asserts that the trial court erred in applying two of the three enhancement factors and erred in finding that discretionary consecutive sentencing was warranted.

The State responds that the trial court properly exercised discretion in sentencing Defendant Frazier. We agree with the State.

### 1. Sentence length

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles"

set out in Tennessee Code Annotated sections 40-35-102 and 103. *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In this case, the trial court detailed its findings and placed its reasons for the sentence imposed on the record. The record establishes that the trial court properly considered the purposes and principles of sentencing. Thus, the trial court's decision to impose a within-range sentence of twenty years for aggravated sexual battery is presumptively reasonable.[3] *Bise*, 380 S.W.3d at 707.

Defendant Frazier argues that, in setting the length of the sentence, the trial court improperly considered two enhancement factors, *i.e.*, that, at the time the felony was committed, the defendant was on a type of release into the community and that the defendant abused a position of private trust. *See* Tenn. Code Ann. § 40-35-114(13)(G), (14). He has not contested, however, the trial court's finding that he had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-115(1). This factor alone was sufficient for the court to impose the maximum within-range sentence, and the record supports this finding. *Carter*, 254 S.W.3d at 345; *Bise*, 380 S.W.3d at 706. Specifically, the record reflects that Defendant Frazier had prior convictions for theft, aggravated burglary, attempted aggravated sexual battery, multiple violations of community supervision, driving on a revoked license, domestic assault, and statutory rape by an authority figure. He has not shown that the trial court abused its discretion in setting the length of his sentence for aggravated sexual battery.

### 2. Consecutive sentencing

The statutory factors governing the alignment of sentences for a defendant convicted of multiple offenses are codified at Tennessee Code Annotated section 40-35-115(b), which provides, in pertinent part:

---

[3] As previously noted, the trial court imposed the statutorily mandated sentence of life without parole for the aggravated rape of a child conviction. *See* Tenn. Code Ann. § 39-13-531(b)(2)(B) (Supp. 2020).

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . . .

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Our supreme court recently held that a trial court should consider the following non-exclusive factors when finding that a defendant has an extensive record of criminal activity:

(1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;

(2) The time span over which the criminal activity occurred;

(3) The frequency of criminal activity within that time span;

(4) The geographic span over which the criminal activity occurred;

(5) Multiplicity of victims of the criminal activity; and

(6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862 (citing Tenn. R. Crim. P. 32(c)(1)).

In this case, the trial court detailed its findings regarding consecutive sentencing on the record, and the decision is presumptively reasonable. *Id*. Specifically, the trial court determined that consecutive sentencing was appropriate after finding that Defendant Frazier was "an offender whose record of criminal activity is extensive" and that he was "convicted of two (2) or more statutory offenses involving sexual abuse of a minor[.]" *See* Tenn. Code Ann. § 40-35-115(b)(2), (5). Upon review, the record fully supports the trial court's finding that Defendant Frazier's record of criminal activity is extensive, and Defendant Frazier does not challenge this finding. This factor alone permitted the court to impose consecutive sentences. *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

The record also supports the trial court's imposition of consecutive sentencing based upon Tennessee Code Annotated section 40-35-115(b)(5). Defendant Frazier was convicted of two or more statutory offenses involving sexual abuse of a minor, and the trial court specifically considered the aggravating circumstances surrounding Defendant Frazier's conduct. Specifically, the court stated:

> With consideration of the aggravating circumstances . . . arising from the relationship between the defendant and the victim in this case, she was stuck with him in that house. There was nothing a six-year-old could do when her mother abandoned her to [Defendant Frazier], . . . her so-called boyfriend. There was nothing that child could do. She tried to get help from her grandmother, and her mother wouldn't listen. Time span of the undetected sexual activity -- it was detected, but anyway, it spanned over many months. The nature and scope of the sexual acts. He had penile-vaginal sexual intercourse with a six-year-old. Horrible.
>
> . . . .
>
> Nature and scope of the sexual acts and the extent of residual physical [and] mental damage on that child will be forever.

The trial court's imposition of consecutive sentences was a reasonable exercise of its discretion, and relief is not warranted.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.


_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE